## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Andrea M. Y.,                                              No. 23-cv-3813 (DLM)

              Plaintiff,

v.                                                                    **ORDER**

Lee Dudek,
Acting Commissioner of Social Security,

              Defendant.

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Andrea M. Y. seeks judicial review of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her benefits. This matter is before the Court on the parties' briefs seeking judgment on the administrative record. (Docs. 8 (Plaintiff's motion), 9 (Plaintiff's brief), 11 (Commissioner's brief), 12 (Plaintiff's reply).) For the reasons below, the Court affirms the Commissioner's decision.

## BACKGROUND

On May 27, 2021, Plaintiff applied for Disability Insurance Benefits ("DIB") alleging that she had been disabled since May 30, 2020. (Tr.[1] at 229–30.)[2] The Social Security Administration ("SSA") denied her claim initially (Tr. at 138–41), and upon reconsideration (Tr. at 144–47). Plaintiff then timely requested a hearing before an Administrative Law Judge ("ALJ"), and the ALJ held a hearing by telephone conference on the matter on September 14, 2022. (Tr. at 148–49 (request for hearing), 37–77 (hearing transcript).) Counsel represented Plaintiff at the hearing, and Plaintiff testified on her own behalf. (Tr. at 37–40, 44–70.) A vocational expert also testified, concluding that if Plaintiff were limited to light work with some postural and environmental limitations, she could still perform jobs in the national economy such as cleaner, housekeeping (Dictionary of Occupational Titles ("DOT") No. 323.687-014), mail room clerk (DOT No. 209.687-026), and office helper (DOT No. 239.567-010). (Tr. at 73–74.) The vocational expert also identified sedentary jobs that Plaintiff could also perform because they are even less strenuous than light work, including working as a document preparer (DOT No. 249.587-018) and film touch up inspector (DOT No. 726.684-010).[3] (Tr. at 74.) Plaintiff's counsel

---

[1] The Commissioner filed the consecutively paginated transcript of the administrative record on February 8, 2024. (Doc. 4.) For ease of reference, citations to the transcript will identify the page number listed on the lower right corner of the document rather than the docket page number or exhibit number.

[2] This application followed the denial of an earlier application for benefits in an SSA decision by a different ALJ dated June 3, 2020. (Tr. at 78–80 (notice of unfavorable decision), 81–93 (decision).)

[3] The vocational expert misidentified the DOT entry for a film touch up inspector, which is indeed classified as sedentary work, but is properly found at DOT No. 726.684-050. *See*

also questioned the vocational expert, primarily about the permissible off-task time for such roles. (Tr. at 76.)

On December 20, 2022, the Commissioner sent a notice of an unfavorable decision to Plaintiff. (Tr. at 14–16 (notice), 17–31 (decision).) The ALJ recognized that Plaintiff suffered from several severe impairments, including "degenerative disc disease; obesity; status post hysterectomy; major depressive disorder; and anxiety disorder." (Tr. at 20.) Despite Plaintiff's mental and physical impairments, the ALJ found that she did not qualify for benefits. (Tr. at 30–31.)

First, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined by 20 C.F.R. § 404.1567(b), provided the job included additional postural and environmental limitations requiring that Plaintiff only occasionally climb ramps and stairs, balance on challenging surfaces, stoop, kneel or crawl, and interact with coworkers, supervisors, and the public; never climb ladders, ropes, or scaffolds or be exposed to hazards such as heights or moving machinery; and be limited to simple, routine tasks in a workplace free of fast-paced production where she performs work involving only low stress, simple decisions, and routine changes without any tandem tasks or teamwork. (Tr. at 23.) Next, the ALJ credited the testimony of the vocational expert that although Plaintiff could not perform her past relevant work based on these limitations, she could still perform other work in the national economy as a cleaner, housekeeping; mail room clerk; office helper; document preparer; and film touch up inspector. (Tr. at 30.)

---

DICOT, 726.684-050, 1991 WL 679601 (Jan. 1991). The ALJ correctly identifies this job in his decision. (*See* Tr. at 30.)

3

Because Plaintiff could still perform some work in the economy, the ALJ found her not disabled under the evaluative process set forth in 20 C.F.R. § 404.1520(g). (*Id.*) Plaintiff appealed the ALJ's decision, but the SSA's Appeals Council denied her request for further review, making the ALJ's decision the final decision of the Commissioner. (Tr. at 1–3.)

Plaintiff then filed this federal action seeking judicial review of the Commissioner's decision. (Doc. 1.) Plaintiff raises two challenges to the ALJ's determination that she is not disabled. She argues that the ALJ's evaluation of the persuasiveness of medical opinion and administrative finding evidence provided by two medical professionals was legally erroneous, and the ALJ's corresponding conclusions lack substantial support in the record. The opinion and finding evidence at issue comes from: (1) Plaintiff's treating psychiatrist, Paul Richardson, M.D.; and (2) consultative physical examiner Ward Jankus, M.D. She claims that, had the ALJ properly evaluated the overwhelming medical and subjective record evidence, and followed the statutory requirements in discussing that evidence, the ALJ would have concluded that she cannot sustain full-time work even in a low stress workplace environment without additional limitations to account for her need to change positions to relieve her back pain. Had the ALJ's evaluation been proper, Plaintiff argues, the ALJ would have found Dr. Richardson's opinion and Dr. Jankus's findings more persuasive. This, in turn, would have led to a more restricted RFC determination and, potentially, a finding of disability. Based on these errors, Plaintiff asks the Court to reverse the ALJ's decision and either enter judgment in her favor and order the award of benefits, or remand the matter for reevaluation by the SSA under the proper standards.

## ANALYSIS

This Court reviews an ALJ's denial-of-benefits decision to determine whether it is supported by substantial evidence in the record as a whole, and whether the decision is infected by legal error. 42 U.S.C. § 405(g); *Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir. 2022). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also Nash v. Comm'r, Soc. Sec. Admin*, 907 F.3d 1086, 1089 (8th Cir. 2018) (characterizing "substantial evidence" as "less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions"). Courts reviewing ALJ decisions must look to the entire administrative record to ascertain whether it contains sufficient evidence to support the ALJ's conclusion. *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). When substantial evidence supports the ALJ's decision, the Court will not reverse, even if substantial evidence also supports a contrary outcome. *Nash*, 907 F.3d at 1089. But if an ALJ used erroneous legal standards, or if they incorrectly applied the law, those may be reversible legal errors. *Joel M. B. v. Kijakazi*, No. 21-cv-1660 (PAM/ECW), 2022 WL 1785224, at *2 (D. Minn. June 1, 2022) (citing *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011)); *Michael B. v. Kijakazi*, No. 21-cv-1043 (NEB/LIB), 2022 WL 4463901, at *1 (D. Minn. Sept. 26, 2022).

Plaintiff does not contest that the ALJ followed the five-step sequential process laid out in 20 C.F.R. § 404.1520(a)(4) for evaluating DIB claims.[4] Rather, Plaintiff asserts that, in assessing her impairments and their impact on her ability to perform work, the ALJ misstated the record and failed to properly apply the law during his review of the medical opinion and administrative finding evidence. This, she claims, resulted in both legal error and a conclusion that is not substantially supported by the record. The Court will take each of her challenges in turn.

## I. THE ALJ DID NOT LEGALLY ERR IN HIS EXPLANATION OF THE PERSUASIVE VALUE OF DR. RICHARDSON'S OPINION, NOR DO THE ALJ'S CONCLUSIONS ABOUT THAT OPINION LACK SUBSTANTIAL EVIDENTIARY SUPPORT.

Plaintiff's first argument is that the ALJ legally erred in assigning little persuasive value to the opinion of her treating psychologist, Dr. Richardson. Plaintiff argues that the ALJ failed to adequately explain why he was unpersuaded by Dr. Richardson's consistent conclusion—given across four separate opinions over several years—that Plaintiff would be absent more than four days per month and could not work more than part-time because

---

[4] Step one of this process involves determining whether a claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If not, the ALJ must next decide (in step two) whether the claimant's impairments are severe, and of a duration of least 12 continuous months. *Id.* § 404.1520(a)(4)(ii). At step three, an ALJ determines whether the claimant's impairments are severe enough to equal a listed impairment under Appendix 1 to Subpart P of Part 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is considered disabled without further inquiry. If not, the ALJ must determine the claimant's residual functional capacity ("RFC") and decide (at step four) whether the claimant can still do their past work given their limitations. *Id.* § 404.1520(a)(4)(iv). Finally, if the ALJ concludes a claimant cannot perform their prior work, step five requires the ALJ to determine whether they can do other work considering their RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v).

of her low tolerance for workplace-related stress. Plaintiff argues that to find Dr. Richardson's opinion unsupported, the ALJ distorts the record by focusing on Plaintiff's ability to take an annual vacation and perform activities like gambling, applying for jobs, and helping her children with distance learning—activities different in quality and quantity from the ability to work full-time. She also contends that the ALJ's focus on her normal mental status examinations ignores that she also had abnormal mental status examinations, and that sometimes she had normal examination results during periods where she needed serious mental health interventions such as hospitalization. She claims this shows that the correlation the ALJ draws between her mental status evaluations and her ability to work ignores the overwhelming record evidence of cyclical, severely-limiting, mental illness symptoms and treatments. Plaintiff also disagrees with the ALJ's representations that Dr. Richardson's opinions are due less persuasive value because he focused solely on Plaintiff's limitations during periods of exacerbated symptoms. In sum, Plaintiff claims that the ALJ's failure to adequately explain why Dr. Richardson's opinions lacked consistency with, and support from, the rest of the record amounts to a legal error under 20 C.F.R. § 404.1520c, and is also, regardless, not substantially supported by the record as a whole.

The Commissioner disputes Plaintiff's claims about Dr. Richardson's opinion, arguing that the ALJ provided a sufficient explanation for its lack of persuasive value which is supported by substantial evidence in the record, even if Plaintiff disagrees with the ALJ's conclusions. The Commissioner notes that some portions of Dr. Richardson's medical opinion objectively lacked probative value because he reached a topic reserved for

the Commissioner: whether a claimant cannot work and is thus disabled. He also points out that the medical provider form Dr. Richardson completed in February 2022 has limited value because it reaches conclusions about functional limitations without providing much insight into the underlying clinical reasons for those conclusions. The Commissioner likewise contends that the record evidence of normal mental status evaluations and Plaintiff's activities is relevant evidence, and the ALJ properly used that evidence to explain his analysis of the factors of consistency and supportability required under 20 C.F.R. § 404.1520c. In particular, the Commissioner claims the ALJ properly explained that Dr. Richardson's opinion lacked support in the record because Dr. Richardson gave outsized attention to Plaintiff's periods of exacerbated symptoms to assess her functional abilities. As to consistency, the Commissioner argues that the ALJ's identification of Plaintiff's ability to travel and engage in other activities, paired with her routinely normal mental status examinations, satisfied his obligations under 20 C.F.R. § 404.1520c to explain the ALJ's reasons for concluding Dr. Richardson's opinion lacked persuasive value.

Under 20 C.F.R. § 404.1520c, an ALJ must consider several factors when allocating persuasive value to opinion and administrative finding evidence, with the factors of supportability and consistency deemed the most important. 20 C.F.R. § 404.1520c(a), (b)(2); *see also Violet G. v. Kijakazi*, No. 21-cv-2105 (TNL), 2023 WL 2696594, at *6 (D. Minn. Mar. 29, 2023) (collecting cases concluding that an ALJ's failure to address and explain supportability and/or consistency warranted remand). In other words, an ALJ's allocation of persuasive value will be considered legally sufficient upon court review for

legal error where they explain supportability and consistency in their decision. While "supportability" and "consistency" are terms of art, the regulations indicate that, as used in this context, the words mirror their everyday meaning: supportability means that an opinion will be considered more persuasive the more it is supported by objective medical evidence; consistency means that an opinion will be more persuasive if it is consistent with the other medical and nonmedical sources relevant to Plaintiff's claim. 20 C.F.R. § 404.1520c(c)(1), (2). Provided that the ALJ's reasoning is sound and supported, they may "accept some, but not all, of a medical opinion." *Austin*, 52 F.4th at 729. But at the very least, the regulations require that the ALJ explain how they considered the supportability and consistency factors in evaluating a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2); *Michael B.*, 2022 WL 4463901, at *2 (failure to articulate supportability analysis is a legal error that requires remand); *Bonnett v. Kijakazi*, 859 F. App'x 19, 20 (8th Cir. 2021) (per curiam) (failure to articulate consistency with the record is a legal error that requires remand). "The ALJ need not use the magic words of 'supportability' and 'consistency,' but it must be clear they were addressed." *Diane M. W.*, No. 20-cv-2651 (SRN/ECW), 2022 WL 4377731, at *5 (D. Sept. 22, 2022) (citing *Svendsen v. Kijakazi*, No. 1:21-cv-1029 (CBK), 2022 WL 2753163, at *8 (D.S.D. July 14, 2022); *Goss v. Kijakazi*, No. 4:21-cv-0663 (LPR/JJV), 2022 WL 1511521, at *3 (E.D. Ark. May 12, 2022)).

Substantial evidence in the record is a separate standard of review from legal error. Under a substantial evidence standard, courts ask whether a reasonable mind could reach the same conclusion as the ALJ on the same evidence, even if other reasonable conclusions

could also be reached. *See Biestek*, 139 S. Ct. at 1154. If yes, courts affirm an ALJ's

conclusions. *See Nash*, 907 F.3d at 1089.

### Dr. Richardson's Treatment Notes and Opinion Evidence

With these two standards of review in mind, the Court will next turn to the record

containing Dr. Richardson's opinions. The record suggests that Plaintiff had been seeing

Dr. Richardson for psychiatric treatment for major depressive disorder and generalized and

unspecified anxiety disorders since around 2010. (*See* Tr. at 978.) In July 2019, Dr.

Richardson noted that Plaintiff struggled with fatigue and stamina but "seem[ed] to be able

to tolerate [part time] work." (Tr. at 345, 534.) In November 2019 Plaintiff reported "I'm

feeling good" to Dr. Richardson. (Tr. at 349, 537.) In March 2020, Dr. Richardson noted

that with the onset of the Covid-19 pandemic and Plaintiff's mandatory leave from work

as a result, Plaintiff experienced increasingly severe depression. (Tr. at 351, 539.) Dr.

Richardson documented concerns that she might relapse and have to be restabilized

because "[h]er stress tolerance has always been a concern with her depression" and she

only "seems to be able to work very part-time in a low stress environment." (*Id.*) He stated

that Plaintiff had a history of "very challenging depression with multiple relapses when she

returns to competitive employment." (Tr. at 354, 542.)

Turning to treatment notes from the period covering Plaintiff's DIB claim, by July

2020, Plaintiff still had been unable to return to work because of the pandemic, and Dr.

Richardson observed that her work had previously exacerbated her depression, requiring

six medical leaves and participation in a partial hospital program on three different

occasions. (Tr. at 355, 543.) Dr. Richardson opined that "[h]er pattern seems clear where

she gets stressed by work, [then] the demands of work which require[] consistency and reliability . . . overwhelm her." (*Id.*) He repeated his conclusion again that Plaintiff "seems to be able to tolerate a very part-time low stress environment but often gets easily fatigued and overwhelmed." (*Id.*) By November 2020, Plaintiff was struggling with medication side effects although "[o]verall her mood [was] good." (Tr. at 359, 547.) She described being "busy" because "[h]er husband [was] working from home" and her "kids [were] home with distance learning." (*Id.*) In February 2021, Plaintiff reported feeling "much the same" as at her November visit. (Tr. at 363, 551.) Dr. Richardson commented that Plaintiff "[h]as struggled with long-term full-time employment." (Tr. at 366, 554.)

Her appointments with Dr. Richardson increased in frequency during 2021. In June 2021, Dr. Richardson documented that while Plaintiff was considering some medication changes to address daytime sleepiness, "[h]er mood [was] generally stable." (Tr. at 555, 557.) In July 2021, Plaintiff found her medication adjustment to generally be working and her mood to be generally stable, although she still endorsed suffering from some daytime fatigue. (Tr. at 564.) In August 2021, Plaintiff's anxiety began to increase to the point she woke up anxious at night, felt less able to focus, appeared more teary, and had episodes of hypomania where she engaged in gambling. (Tr. at 568.) Dr. Richardson considered the possibility that Plaintiff might have bipolar disorder and noted medication changes might be needed. (Tr. at 568, 570.) By September 2021, Plaintiff's medications had indeed been changed and, while she felt less anxious and prone to ruminating, "[s]he [said] she is tired, and this has been an unrelenting complaint that [Dr. Richardson] ha[d] no clear answer for despite numerous med changes." (Tr. at 573.) Dr. Richardson documented that Plaintiff

11

was "feeling so much stress in her life" because of bankruptcy proceedings and her unemployment. (*Id.*) In November 2021, Dr. Richardson noted Plaintiff was suffering from low energy and weight gain and he contemplated changing her medications again, although she had generally normal mental status exam results. (Tr. at 639–40.) In January 2022, Plaintiff saw another behavioral health physician for a consultation for transcranial magnetic stimulation as a new treatment option for her depression. (Tr. at 975–81.) By February 2022, Plaintiff continued to struggle with depression, low energy, and weight gain, although she again had normal mental status exam results. (Tr. at 643–44.)

During this time, Dr. Richardson gave a formal treating source statement on February 22, 2022—the opinion that the ALJ focuses on in his decision. (Tr. at 622–24.) In that statement, Dr. Richardson noted he had been seeing Plaintiff every three to four months for the past five years for her depression. (Tr. at 622.)  Dr. Richardson identified Plaintiff's symptoms as "[d]epressed mood, low energy, [low] motivation, [and] anxiety." (*Id.*) Despite these symptoms, Dr. Richardson identified Plaintiff's prognosis and treatment response as "fair" because her mental health symptoms showed partial responsiveness to medications and therapy, although he remarked that she had a history of relapsing into more severe symptoms. (*Id.*) Dr. Richardson opined that Plaintiff would, on average, be absent for "[m]ore than four days per month" because of her impairments or their treatment, and that her impairments would likely last for at least 12 months. (Tr. at 624.)

Dr. Richardson also provided his assessment of Plaintiff's functional limitations as to "work-related mental activities" on this form, evaluating Plaintiff as has having an excellent ability to understand, remember, and carry out short, simple instructions, make

judgments on simple work-related decisions, interact appropriately with the public, ask simple questions or request assistance, be aware of normal hazards and take appropriate precautions in response, and travel in unfamiliar places or use public transportation; a good ability to remember locations and work-like procedures, get along with coworkers and peers, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and set realistic goals or make plans independent of others; a fair ability to understand and remember detailed instructions, sustain an ordinary routine without special supervision, work with or near others without distraction, complete a normal workday or workweek, perform work at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the workplace setting; but a poor ability to maintain attention and concentration for extended periods and perform activities within a schedule, maintain regular attendance, and be punctual. (Tr. at 622–23.) He supported this assessment by his clinical findings that during "ongoing assessments" Plaintiff has a "history of poor attention span," "poor response to stress," and a "history of failed attempts to return to work . . . due to severe depression," noting that the "earliest date these limitations apply" was November 21, 2017. (Tr. at 623, 624 (emphasis omitted).)

After providing this formal treating source statement, Dr. Richardson continued to see Plaintiff regularly for psychiatric care. In April 2022, Dr. Richardson noted Plaintiff's mood was generally okay although she continued to struggle with energy and motivation. (Tr. at 647–49.) In May 2022, Dr. Richardson documented that Plaintiff was finding "[i]t's hard for her to push herself, hard to get out of bed," and he struggled to determine the right

medication combination for her because "[s]he's been on a multitude of different antidepressants with poor/inconsistent response." (Tr. at 651.) Dr. Richardson again recorded her mental status exam results as generally normal. (Tr. at 652–53.) By June 2022, Plaintiff described having been "hospitalized at Regions [Hospital]" since her last appointment because she "was feeling out of sorts, not able to focus." (Tr. at 655; *see also* Tr. at 883 (containing May 2022 emergency room notes that Plaintiff had presented tearfully, felt unable to do anything, did "not want to live like this anymore," and did not think she even had the ability to attend a partial hospitalization program).) It appears Plaintiff participated in a partial hospitalization program after this visit to the emergency department. (Tr. at 68.) Despite this, Dr. Richardson recorded her mental status exam results as again generally normal during her June appointment. (Tr. at 656–57.) In July 2022, Dr. Richardson noted that Plaintiff had been experiencing low mood and energy, anhedonia, irritability, difficulty with sleep, changes to her appetite, suicidal ideation, and other markers of depression. (Tr. at 635.) He also observed she had gained significant weight and had variable fatigue. (Tr. at 636.) Plaintiff intended to try a new medication—lithium—and Dr. Richardson documented that "[s]he br[oke] into tears during the visit," but recorded her mental status exam results as normal. (*Id.*)

### *ALJ's Analysis of Record Evidence*

The ALJ reviewed Dr. Richardson's opinion evidence in his December 20, 2022 decision, specifically finding Dr. Richardson's February 2022 opinion unpersuasive because it lacked support for the degree of limitations found in its conclusions and conflicted with other record evidence. (Tr. at 28.) The ALJ found that Dr. Richardson's

14

observations about Plaintiff's poor attention, concentration, and ability to adhere to a schedule of activities, as well as Dr. Richardson's conclusion that she would be off task 20% of the time and absent more than four days each month, failed to align with other evidence. (*Id.*) The ALJ found that the other record evidence demonstrated that "[w]hile the claimant did have brief periods of exacerbation in symptoms, these did not persist, and often, mental status exam findings were within normal limits." (*Id.*) The ALJ also observed that "[t]he claimant was able to travel, gamble,[5] apply for a job, and help her children with distance learning." (*Id.*)

### *Absence of Legal Error*

The Court has studied the portions of the record that the ALJ relies on for his explanation of the lack of support from, and inconsistencies between, Dr. Richardson's opinion evidence and the rest of the record. The Court need not agree with the ALJ's conclusions about the persuasive value of Dr. Richardson's opinion so long as the ALJ provides the required discussion of "supportability" and "consistency" laid out in 20 C.F.R. § 404.1520c and those conclusions are supported by the record. *See Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015).

---

[5] The Court finds it troubling that the ALJ considers Plaintiff's ability to gamble without any caveat that, unlike other activities, this activity appears to be a symptom of her mental impairments based on Dr. Richardson's assessment, which complicates the ALJ's treatment of this activity purely as evidence of Plaintiff's functional abilities. (*See* Tr. at 568 (discussing episodes of hypomania during which Plaintiff engaged in compulsive gambling).)

Here, the ALJ found that Dr. Richardson did not provide an adequate explanation for the limitations that he assigned to Plaintiff. It is true that Dr. Richardson did list some of his reasoning—specifically, Plaintiff's history of poor attention span and responses to stress (*see* Tr. at 622)—although it is also generally true that the source statement form Dr. Richardson completed is brief and lacks citations to specific evidence (*see* Tr. at 622–24). The question here is whether, in analyzing the opinion evidence presented, the ALJ analyzed the two required factors. *See Bonnett*, 859 F. App'x at 20. Supportability is clearly discussed, as the ALJ notes that Plaintiff's normal mental status examinations did not support Dr. Richardson's conclusions. Likewise, on the factor of consistency, the ALJ pointed to evidence that Plaintiff's activities were inconsistent with Dr. Richardson's conclusions on Plaintiff's limitations. The Court will not disturb this finding where the regulatory requirements are met and the explanation is consistent with record evidence. *See* 20 C.F.R. § 404.1520c.

Plaintiff argues that the ALJ ignored important considerations, including Dr. Richardson's treatment relationship and specialization. *See* 20 C.F.R. § 404.1520c(3)–(4). To provide context, the governing regulations do not require that an ALJ give specific weight to any medical opinion or findings. *See Austin*, 52 F.4th at 728 (citing 20 C.F.R. § 404.1520c(a)). This reflects a change to the regulations that once required an ALJ to give a treating medical professional's opinion deference and controlling weight. *See* 20 C.F.R. § 404.1527. As of March 27, 2017, ALJs are under the updated requirements found at 20 C.F.R. § 404.1520c. *Compare* 20 C.F.R. § 404.1527 (applicable to claims filed before March 27, 2017) *with* 20 C.F.R. § 404.1520c (applicable to claims filed after March 27,

2017). According to these updated regulations, an ALJ must now consider the persuasiveness of medical opinions and findings and explain how they reached their conclusions according to certain factors. *See* 20 C.F.R. § 404.1520c(c)(1)–(5). These factors require that an ALJ "evaluate the persuasiveness of medical opinions by considering (1) whether they are supported by objective medical evidence, (2) whether they are consistent with other medical sources, (3) the relationship that the source has with the claimant, (4) the source's specialization, and (5) any other relevant factors." *Austin*, 52 F.4th at 728 (quoting *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022)). The first two factors of supportability and consistency are the most important and are the only two factors that an ALJ must explain in their decision, even though all of the factors must be considered. 20 C.F.R. § 404.1520c(a), (c)(1)–(2); *see also Violet G.*, 2023 WL 2696594, at *6. In other words, an ALJ's allocation of persuasive value will be considered legally sufficient upon court review for legal error where they expressly explain only the factors of supportability and consistency in their decision. That means that here, the fact that the ALJ did not expressly discuss Dr. Richardson's treating relationship with Plaintiff or specialization does not amount to a legal error. Moreover, it is clear that the ALJ did consider Dr. Richardson's treatment records as Plaintiff's longstanding treating psychiatrist throughout his opinion. (Tr. at 27–28.)

Plaintiff likewise argues that the ALJ overlooked Dr. Richardson's other three opinions, only expressly considering one of the four Plaintiff identifies. Plaintiff claims that "Dr. Richardson has repeatedly – in March 2020, July 2020, February 2022, and July 2022 – opined that [Plaintiff] is limited to part-time work due to inability to handle the

stress of a full-time work schedule, *i.e.* she is disabled." (Doc. 9 at 19 (citing Tr. at 351, 355, 624, 637).) The Court observes that the evaluations cited by Plaintiff for the March 2020, July 2020, and July 2022 "opinions" are not formal medical provider statements, but reflect the typical notes of an outpatient psychiatric progress encounter. (Tr. at 351, 355, 637.) The record is replete with such progress encounter notes, such that if the ALJ had to include each of these encounters as one of Dr. Richardson's opinions, there would be far more than four to consider. And this aside, while an ALJ must consider all of a medical source's statements and opinions together in reaching his conclusions, *see* 20 C.F.R. § 404.1520c(b)(1) (explaining that medical opinions and prior administrative medical findings will be considered based on each medical source's *combined* opinions or findings), an ALJ need not discuss every piece of evidence considered in reaching their conclusions, *see Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted" and their "failure to cite specific evidence does not indicate that such evidence was not considered.") (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Additionally, it is clear that the ALJ reviewed the totality of Dr. Richardson's treatment notes as reflected by various citations to those notes in other parts of his decision. (*See* Tr. at 27–28.)

Finally, Plaintiff argues that the ALJ ignored how Dr. Richardson's opinions across the relevant period show both support for, and consistency with, his conclusions based on years of treatment evidence. In other words, Plaintiff does not dispute that the ALJ discussed supportability and consistency, but argues the quality of analysis is lacking. (*See,*

*e.g.*, Doc. 9 at 16 ("The ALJ failed to perform a *proper* supportability and consistency analysis . . . ." (emphasis added)).) This is not a legal error argument, but a substantial evidence argument, which the Court addresses next.

### Presence of Substantial Supporting Evidence

While the Court finds no legal error in the ALJ's compliance with 20 C.F.R. § 1520c's discussion of the required factors, courts may still reverse opinion evidence if an ALJ's conclusions lack substantial support in the record as a whole—a separate analysis and standard of judicial review of agency decision-making. *See Biestek*, 139 S. Ct. at 1154; *Nash*, 907 F.3d at 1089. Plaintiff makes some arguments that ask the Court to find a lack of substantial evidentiary support for the ALJ's conclusions about Dr. Richardson's opinion, citing to Social Security Rulings ("SSR") that Plaintiff claims the ALJ failed to apply. *See* SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996); SSR 85-15, 1985 WL 56857 (S.S.A. Jan. 1, 1985).

On this record, the Court cannot conclude that the ALJ's decision denying benefits was outside the zone of reasonable choice. *Papesh*, 786 F.3d at 1131. While there is some evidence in the record that Plaintiff sometimes required hospitalization and often suffered from depression causing her low energy to the point of sometimes finding it hard to get out of bed (*see* Tr. at 60, 68, 622, 639–40, 42–44, 651, 647–49, 635), there is also evidence that Plaintiff functioned well enough to receive normal mental evaluations and engage in various life activities (*see* Tr. at 27–28). The ALJ considered the record and reached conclusions that, while disputed, are grounded in the evidentiary record. *See Gonzales*, 465 F.3d at 894. This Court's judicial review of the ALJ's decision is deferential, and it will

19

defer to an ALJ's firsthand findings where they represent one of the possible reasonable conclusions that could be reached on the evidence. *Papesh*, 786 F.3d at 1131. Here, substantial evidence in the record as a whole supports the ALJ's conclusions.

## II.     THE ALJ DID NOT LEGALLY ERR IN HIS EXPLANATION OF THE PERSUASIVE VALUE OF DR. JANKUS'S FINDINGS, NOR DO THE ALJ'S CONCLUSIONS ABOUT THOSE FINDINGS LACK SUBSTANTIAL EVIDENTIARY SUPPORT.

Plaintiff's next argument is that the ALJ legally erred in assigning little persuasive value to the prior administrative medical findings of Dr. Jankus, a reviewing expert state psychologist, as to Plaintiff's need to shift positions regularly. Plaintiff argues that the ALJ should have sought clarification from Dr. Jankus if the ALJ believed Dr. Jankus's findings were too vague (as he claims). She also asserts that the ALJ mischaracterized Dr. Jankus's findings by reading them to focus on Plaintiff's functional abilities during times of spasms. In fact, Dr. Jankus based his findings on the broader record evidence on how long Plaintiff could—during any eight-hour workday without regard to spasms—stand or sit without needing to change positions. Plaintiff likewise argues that the ALJ wrongly discounted Dr. Jankus's reliance on Plaintiff's subjective statements about her pain. Finally, Plaintiff contends that the ALJ provided no explanation on the consistency of Dr. Jankus's findings as required by 20 C.F.R. § 404.1520c, and that, had he done so, he would have found the record amply supported those findings. The Court thus understands Plaintiff to argue both that the ALJ legally erred by failing to discuss the required consistency factor, and that substantial evidence fails to support his conclusions.

The Commissioner disagrees, arguing that the ALJ complied with the regulatory requirements in discussing Dr. Jankus's findings and that those findings are rooted in record evidence. The Commissioner claims that the ALJ rightly found Dr. Jankus's opinion did not provide specific functional limitations that the ALJ could incorporate into Plaintiff's RFC, but that such vagueness did not demand further record development when the record as a whole contained enough evidence to reach a disability determination. As to the ALJ's focus on spasms, the Commissioner contends that the ALJ reasonably interpreted Dr. Jankus's statements as relating to Plaintiff's variable spasms, and that, regardless, the ALJ's assignment of persuasive value did not solely rest on that interpretation. The Commissioner also argues that the ALJ reasonably discounted Dr. Jankus's reliance on Plaintiff's subjective complaints which, while part of the record evidence the ALJ considered, did not support the level of limitations Plaintiff claimed. As to the consistency factor under 20 C.F.R. § 404.1520c, the Commissioner argues that the ALJ provided the analysis required because Dr. Jankus's findings—while consistent with Plaintiff's subjective claims of pain—was inconsistent with the sparse treatment she received for her back impairment. Because the ALJ met the regulatory requirements, the Commissioner asks the Court to affirm the ALJ's decision.

### Dr. Jankus's Prior Administrative Medical Findings

Dr. Jankus evaluated Plaintiff only once on December 7, 2021. (Tr. at 615–20.) He noted Plaintiff's chief complaint was back pain stemming from a car accident in 2019, after which, magnetic resonance imaging ("MRI") tests showed she had sustained "a stable right posterior paracentral disk protrusion mildly compressing the right S1 nerve root." (Tr. at

615.) Dr. Jankus recorded Plaintiff's subjective reports of pain, noting that Plaintiff claimed with time and treatment her pain had "improved about 65%" since the accident, although it remained "an everyday issue" with periodic flare-ups of "10/10" pain accompanied by sciatic pain in her right leg. (Tr. at 615–16.) Plaintiff claimed the cause of flare-ups appeared to be everyday things like "bend[ing] or reach[ing] or mov[ing] wrong," including doing "repetitive activities like raking or laundry . . . or even sneezing." (Tr. at 616.) Plaintiff's course of treatment had been generally conservative—"chiropractic, acupuncture, cupping, etc."—and Dr. Jankus noted that Plaintiff felt "very nervous" about more aggressive recommended treatments such as injections. (Tr. at 615.) Dr. Jankus recorded that Plaintiff claimed she could walk about a block or so, stand for about 30 minutes as long as she could freely move around, but could only tolerate sitting for about 10 to 15 minutes. (Tr. at 616.) He also documented that Plaintiff estimated she could stand for about four hours, sit for about one hour, and needed to lie down for about the remaining three hours out of every eight-hour workday. (*Id.*) Plaintiff reported to Dr. Jankus that she found relief from her pain by lying down intermittently, changing positions, lying in a fetal position, taking over-the-counter pain medications, and at times prophylactically using muscle relaxants if she anticipated being out in the community a lot during a day. (Tr. at 616–17.)

Turning to Dr. Jankus's physical examination of Plaintiff, he noted that while she seemed generally healthy, she did "cry at the end of the appointment discussing the frustration about how her back pain has changed her life." (Tr. at 617.) He found her spine normally aligned and documented a full range of upper body motion, although Plaintiff

had some lower body range of motion limitations due to pain in her legs. (*Id.*) He also observed that Plaintiff had no lumbar spasm and little tenderness at her right lumbosacral junction area, although Plaintiff claimed she felt pain more internally and it occurred largely based on her position rather than on applying pressure. (*Id.*) He found she had full strength in her legs, although she had pain and some difficulties with a straight-leg raise in her right leg. (*Id.*) Plaintiff walked with caution and avoided quick movements, Dr. Jankus observed, and she exhibited a mild amount of stiffness and limping on her right side. (Tr. at 618.) Dr. Jankus further documented that Plaintiff conducted the entire appointment from a standing position and needed to move around sometimes because "standing is her more comfortable position compared to sitting." (*Id.*)

Dr. Jankus's concluded that Plaintiff suffered from "[d]iskogenic back pain" involving "some nerve root irritation coming down the right leg into the calf, probably from irritation of the right S1 nerve root," although he noted that her leg symptoms are not always present and he did not see evidence of any "severe nerve root damage on exam." (*Id.*) Plaintiff's preference for a standing posture was "fairly classic for diskogenic back pain," Dr. Jankus observed. (*Id.*) He concluded that,

> [i]n her case, I think she does need to change positions up and down off her feet, and I do not doubt that she is basically changing her positions up and down off her feet just as she describes above. It is hard to be more precise because there can be variability from day to day and week to week.

(*Id.*)

23

***ALJ's Analysis of Record Evidence***

The ALJ considered Dr. Jankus's findings and concluded they were unpersuasive, determining they were both "vague" and dependent upon "whether [Plaintiff] was experiencing spasms or not, [which] the claimant testified . . . happened infrequently." (Tr. at 25.) The ALJ also noted that Plaintiff "had little treatment prior to [Dr. Jankus's] evaluation with respect to her low back which does not support the degree of limitation alleged." (*Id.*) Finally, the ALJ opined that Dr. Jankus's findings "appear[ed] to be primarily based on the claimant's allegations." (*Id.*)

***Absence of Legal Error***

Upon review under a legal error standard, the Court respectfully disagrees with Plaintiff that the ALJ failed to discuss the factor of consistency as required by regulation. *See* 20 C.F.R. § 404.1520c(c)(2). Not only did the ALJ address the factor of supportability as required, noting that there was no objective evidence Plaintiff had frequent spasms or was as limited as she subjectively claimed, the ALJ also discussed the inconsistency of Dr. Jankus's findings with Plaintiff's "little treatment prior to this evaluation with respect to her low back which does not support the degree of limitation alleged." (Tr. at 25). This explanation satisfies the regulatory requirement that the ALJ analyze what medical and nonmedical evidence contradicted Dr. Jankus's findings, and thus, limited the persuasive value of those findings. *See* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical

24

opinion(s) or prior administrative medical finding(s) will be."). The Court therefore finds no legal error in the ALJ's discussion of Dr. Jankus's findings.

### Presence of Substantial Supporting Evidence

The Court also finds that substantial evidence in the record as a whole supports the ALJ's determination that Plaintiff could still perform work despite her back impairment. Even Dr. Jankus appears to admit in his assessment that he could not recommend a more precise set of limitations because of the variability of Plaintiff's symptoms, making it reasonable that the ALJ concluded Dr. Jankus's limitations were vague. (Tr. at 618.) And while Plaintiff received extensive treatment for her back pain prior to her disability onset date in May 2020 from chiropractic specialist Daniel Barrett, D.C. and neurologist Michael P. Sethna, M.D., during the relevant period between mid-2020 through 2021, it is true that she had more limited treatments that only increase again in 2022 (post-Dr. Jankus's evaluation) after some exacerbating accidents. For example, Dr. Barrett treated Plaintiff for back pain on numerous occasions at a typical frequency of twice each week for all of 2019, but then throughout 2020 at a sharply decreasing frequency. (*See, e.g.*, Tr. at 410–25, 459–87.) Dr. Barrett referred Plaintiff to neurologist Michael P. Sethna, M.D., who saw Plaintiff in December 2019, but only in June, July, and August 2020 for MRI tests and pain management. (*See, e.g.*, Tr. at 381–82, 391–96.) A reasonable mind might conclude, as the ALJ did (*see* Tr. at 25), that these less frequent treatments during 2020 indicated that Plaintiff's back pain was not as limiting as she claimed.

As to Plaintiff's claim that the ALJ failed to properly consider her subjective claims of pain as evidence that Dr. Jankus could rightly rely on in reaching his conclusions, the

Court again respectfully disagrees. An ALJ must consider a Plaintiff's subjective claims of limiting pain according to factors referred to as the "*Polaski* factors." *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (requiring ALJ to consider (1) the plaintiff's daily activities; (2) the duration, frequency, and intensity of the plaintiff's pain; (3) any precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the plaintiff's functional restrictions). This aligns with the requirements set forth by the SSA in SSR 16-3p. *See* SSR 16-3p, 2017 WL 5180304, at *7–8 (S.S.A. Oct. 25, 2017) (discussing the factors an ALJ must use to evaluate the intensity, persistence, and limiting effects of an individual's symptoms).

Here, the ALJ expressly referenced SSR 16-3p, opining that sometimes a claimant's symptoms of pain are greater than the objective medical evidence alone supports and an ALJ thus must consider factors that include: the pain's location, duration, frequency, and intensity; what precipitates or aggravates their pain; what medication or other measures or treatments give pain relief; and any other factors that might be informative in setting limitations based on a person's pain. (Tr. at 24.) The ALJ considered these *Polaski* factors, assessing the degree to which Plaintiff's pain exceeded the sum of the record's objective medical findings about her back impairment. Specifically, the ALJ considered Plaintiff's daily activities, her functional limitations in daily life, the causes and locations of her back pain, the course of her pain over time, as well as her treatment by a chiropractor, use of postural changes, and steroid treatment that all appear to have given her some pain relief, among other things. (Tr. at 24–27.) Therefore, the Court cannot conclude that the ALJ

failed to adequately consider Plaintiff's subjective accounts of her pain, or that the ALJ improperly discounted Dr. Jankus's findings because of any such failure.

On one point, however, the Court does agree with Plaintiff: the ALJ's conclusion that Dr. Jankus's assessment related to periods when Plaintiff was suffering spasms is inscrutable. Dr. Jankus nowhere mentions that he assessed Plaintiff as having frequent spasms or that his limitation recommendations related to only times when she was experiencing such spasms. In fact, he documents "[n]o lumbar spasm noted." (Tr. at 617.) Most of Plaintiff's treatment for spasms appears to have occurred before her 2020 disability on set date or after her 2022 exacerbations of her original injury which post-date Dr. Jankus's evaluation. (*See, e.g.*, Tr. at 54, 57–58, 461, 494, 935, 982, 1012, 1024, 1040, 1057, 1071, 1090.)

Nevertheless, even assuming that this portion of the ALJ's conclusion contains factual misstatements about the context of Dr. Jankus's findings, the question is whether those misstatements changed the outcome of the ALJ's decision. *See Grindley*, 9 F.4th at 629 ("Even if the ALJ made some misstatements in his order, reversal of an ALJ's decision is not required if an error was harmless, meaning '[t]here is no indication that the ALJ would have decided differently' if the error had not occurred." (quoting *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008)). Here, the Court finds that the ALJ's misstatements were harmless. For one thing, the ALJ's conclusion that Plaintiff claimed to suffer spams infrequently is accurate. (*See* Tr. at 58 ("And I have days [with debilitating spasms] not often, but I do get them.").) For another, the ALJ's bases for finding Dr. Jankus's opinion unpersuasive rests on more than Dr. Jankus's alleged focus on Plaintiff's

limitations when experiencing infrequent spasms. Specifically, the ALJ's other reasons for discounting Dr. Jankus's findings include that the findings were too vague to correlate to RFC limitations; inconsistent with Plaintiff's infrequent medical treatment for her back impairments; and relied too heavily on Plaintiff's subjective account of how limiting her pain was when her treatment record did not support that degree of limitation. These reasons provide substantial evidence in the record for the ALJ's decision, and the Court therefore finds no basis to reverse the ALJ's ultimate conclusions.

## ORDER

Based on the above, as well as the files, records, and proceedings in this case, **IT IS ORDERED** that:

1.    Plaintiff's brief seeking judgment on the administrative record (Doc. 8) is **DENIED**; and

2.    Defendant's brief seeking judgment on the administrative record (Doc. 11) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 4, 2025                    *s/Douglas L. Micko*
                                                            DOUGLAS L. MICKO
                                                            United States Magistrate Judge